1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN LAM,

11              Petitioner,               No. CIV S-10-0829 EFB P

12        vs.

13   KATHLEEN DICKINSON,
     Acting Warden,
14
                Respondent.              ORDER
15
     _____/
16

17          Petitioner is a state prisoner proceeding through counsel with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The parties have consented to the exercise of this

19   court's jurisdiction pursuant to 28 U.S.C. § 636(c).  Petitioner challenges a 2006 judgment of

20   conviction entered against him in the Sacramento County Superior Court on a charge of first

21   degree murder with use of a firearm.  He seeks relief on the grounds that: (1) jury instruction

22   error violated his right to due process, to present a defense, and to a fair trial; and (2) the trial

23   court violated his rights to due process, a fair trial, compulsory process, and to present a

24   complete defense improperly when it refused to admit certain statements into evidence at his

25   trial.  Upon careful consideration of the record and the applicable law, the undersigned denies

26   petitioner's application for habeas corpus relief.

                                        1

**I.      Factual Background[1]**

On a December night just before Christmas, Matthew Seivert was lured to Tahoe Park in Sacramento by his ex-girlfriend, Nicole Carroll.  As the couple talked on a park bench, a group of 12 youths in three separate cars waited stealthily to attack him.  When Seivert got into his car and attempted to leave, the youths blocked his exit and one of them shot him to death.

Carroll and four members of the group were charged with murder.  Six other youths, who were granted immunity, testified at the trial, during which the jury heard evidence of a conspiracy to "jump" Seivert because he had made racial slurs about Asians.  The jury found all five defendants guilty of first degree murder (Pen.Code, § 187, subd. (a))[2] and found true the special circumstance that the shooter, defendant Hung Thieu Ly, committed the murder while lying in wait (§ 190.2, subd. (a)(15)) (hereafter section 190.2(a)(15)).

Ly and his four convicted accomplices – Nicole Carroll, Jimmy Chi Cooc, John Dich and Chan Venh ("John") Lam – appeal.  Their arguments include erroneous jury instructions, error in admission and exclusion of evidence, prosecutorial misconduct, and the sufficiency of the evidence to support the verdict.  We find no prejudicial error.  With the exception of a minor sentencing correction as to defendant Ly, we shall affirm all five judgments.

**FACTUAL BACKGROUND**

**The shooting**

On December 23, 2003, 19-year-old Matthew Seivert was living with his mother, Stepheny Milo, at her home in East Sacramento.  Seivert and Carroll had been high school sweethearts, but they broke up when Carroll moved to Los Angeles in 2001.  Around 8:00 p.m., Carroll called for Seivert, but he was not home.  Seivert received a second call shortly before midnight, after which he asked his mother if he could borrow her Toyota Camry so he could "see Nicole."  Although Milo initially refused, she finally relented and let her son borrow the car.

Around 1:45 a.m., Sacramento City Police Officer Barry Lee went to Tahoe Park in response to a report of shots fired.  Lee drove around the park, but saw nothing.  At 2:20 a.m., Lee returned to a

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[2]  Undesignated statutory references are to the Penal Code.

2

location on Eighth Avenue, very close to the park, and discovered the Camry, which had crashed up against a chain link fence. Seivert, unconscious and incoherent, was transported by ambulance from the Camry to the hospital.

Seivert suffered two gunshot wounds, one to the left side of the head and another to the right chest.  He also suffered lacerations and abrasions, consistent with having been struck by flying glass. Seivert died from his wounds.

Three bullet jackets from a .38-caliber Charter Arms revolver were recovered from the Camry.   There was possible bullet damage to the front driver's-side window, the rear driver's-side window and the rear window.  A detective who inspected the Camry opined that gunshots had pierced each of the three windows.

**The plot**

Six immunized witnesses – Quoc Lam,[3] Sieu Nguyen, Johnson Phan, Dac Su, Davis To and Damon Voong – testified about a meeting that took place at Voong's house on the evening of December 23, during which the plan was hatched to attack Seivert at Tahoe Park.  Sometimes their versions coincided; often their testimony conflicted not only with each other, but with the same witness's prior statements.  In accordance with settled principles (*People v. Sotomayor* (1996) 47 Cal.App.4th 382, 386, 54 Cal.Rptr.2d 871; *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574] ), we recite the evidence in the light most favorable to the judgments.

John Lam, who was then dating Nicole Carroll, was angry with Seivert for making disparaging remarks about Asians in phone calls to Carroll, saying things like "fuck Asians" and referring to them as "Chinks."  Lam devised a plan whereby Carroll would phone Seivert and ask him to meet her at Tahoe Park; Lam and his friends would drive to the park, wait for Seivert and then "jump" him or beat him up.

Lam called his cousin Quoc and told him about the plan to lure Seivert to the park and jump him. Quoc went to his house and got his nunchakus.  He also had golf clubs in his trunk, which he thought could be used.  Lam called his cousin Davis To and told him he wanted to "kick this white kid's ass" for making racial slurs.  Lam's friends and relatives contacted others, until 11 young men arrived at Voong's house, where they met with Carroll and Lam.  At the meeting were the five defendants – Carroll, Cooc, Dich,

---

[3]  To avoid confusion with defendant John Lam, we hereinafter refer to John Lam as "Lam" and his cousin, Quoc Lam, as "Quoc."

Lam and Ly – as well as the witnesses who testified under a grant of immunity.

At Voong's house, Lam brought up the subject of beating up the "white boy" to "teach him a lesson" about using racial slurs. Carroll said she wanted Seivert beaten up because she did not like him. Lam explained that Seivert would meet Carroll at Tahoe Park, that the group should wait for him to get out of his car and then jump him. Quoc intended to approach Seivert from behind, hit him a couple of times and smash his car with the nunchakus. Su intended to jump out of Quoc's car and beat Seivert up. There was some discussion at the house about Cooc and Ly having guns. However, killing or shooting Seivert was not explicitly discussed.

During the meeting at Voong's house, Carroll called Seivert. Later, after speaking on her cell phone, she told the group that Seivert had called and they should go to Tahoe Park. Lam told everyone "let's go" and instructed them to leave for the park. He told Quoc to meet him on the other side of the park and to block the Camry.

The group traveled to Tahoe Park in three separate vehicles. The table below[4] shows the vehicles that were driven and their respective drivers and occupants.

Acura RSX

**John Lam** (driver )*
**Nicole Carroll**\*

Honda Pilot

**John Dich** (driver )*
**Jimmy Chi Cooc**\*
**Hung Thieu Ly**\*
Johnson Phan
Sieu Nguyen
Damon Voong
Tommy Vu

Honda Accord

Quoc Lam (driver )
Dac Su
Davis To
Johnny Truong

*Defendants' names appear in boldface type.

---

[4] The table is derived from Ly's opening brief. No one disputes its accuracy.

4

As they drove to the park, Cooc and Dich had a conversation about a gun. Dich wanted to see Cooc's nine-millimeter gun, and it was passed around the Honda Pilot. Ly's .38-caliber revolver was also passed around. Ly tied a blue or black rag around his face that covered his nose and mouth.

The three cars split up when they got to the park. They waited about 15 minutes for Seivert to arrive. Carroll alerted them by phone that Seivert was on his way.

Seivert arrived at the park, got out of his Camry and approached Carroll, who was seated on a bench. The couple talked for a few minutes. Seivert reached for Carroll, but she pulled away. Seivert then returned to the Camry. Lam and Dich each said, "Let's go get him," or words to that effect. Because Seivert had backed into the parking space, someone in the Pilot said, "Block him out." Dich then drove the Pilot toward the driver's side of the Camry, parking at an angle. The Camry moved forward a little, but Lam's Acura RSX also pulled in front of the Camry, causing it to stop. The Camry was blocked in and had no room to leave. Quoc retrieved the nunchakus and Dac Su took out a golf club.

Ly got out of the Pilot and pulled a gun from his waistband. Cooc also got out of the car with his gun drawn. Vu threw a Heineken bottle, which hit the Camry. Ly stood in front of the Camry and pointed his gun at the front windshield saying, "Don't move" or "stop, stop, stop." Some witnesses thought Seivert revved the engine and the Camry may have moved forward a little.

Ly fired at least three shots at the Camry. The first shot was fired at the front windshield, the second shot from the driver's side door, and the third from behind the Camry by the trunk. The group then returned to their vehicles and drove back to Voong's house. On the way back, Ly exclaimed, "I got him in the head," or "I got him, I got him. He almost ran me over." Ly also said, "I did what I had to do," and "if he hadn't of moved I wouldn't have shot him. He almost ran me over."

Back at the house, Carroll smiled and said something to the effect of "Oh, well, I didn't like him anyways." About a week later, Lam called To and said he had spoken with a homicide detective and that he (To) should keep his story straight.

On January 10, 2004 (all further calendar references are to that year), about three weeks after the shooting, police recovered a loaded nine-millimeter semiautomatic firearm from Cooc's residence. Two days later, police recovered the .38-caliber revolver used to kill Seivert from Dich's residence.

Police recovered a box of .38-caliber live ammunition from Ly's home. The cartridges were loaded with soft-point, brass-jacketed

Winchester .38 Special bullets – similar in all respects to the bullets fired into the Camry. They also found two bandanas, one dark navy blue and the other black.

Mobile phone records showed that defendants and the other participants placed numerous calls on their cell phones to one another throughout the late night and early morning hours of December 23 and 24, 2003. Carroll's cell phone records showed that she called Seivert's residence at 7:22 p.m. and 11:47 p.m. In addition, she called Seivert's cell phone at 12:39 a.m., 12:47 a.m. and 12:55 a.m. (minutes before the shooting), each time using "*67," which is a means of blocking the calling number from display on the receiver's phone.

**Defense case**

None of defendants testified. Defense counsel focused their defense on four central themes: (1) the prosecution witnesses who testified about the plot and shooting were unreliable and self-contradictory; (2) no one who participated in the plot to "jump" Seivert said anything about shooting him; (3) Ly's decision to shoot Seivert was the unanticipated act of a maverick, and thus the crime of murder was not the natural and probable consequence of the agreement to beat up the victim; and (4) under the doctrine of imperfect self-defense, Ly's shooting of Seivert was not murder because Ly harbored a good faith but unreasonable belief that Seivert was trying to run him over with the Camry.

The jury found Ly guilty of first degree murder with personal use of a firearm (§ 12022.53, subd. (d)); the jury also found true as a special circumstance that he intentionally killed the victim by lying in wait. Defendants Carroll, Cooc, Dich and Lam were found guilty of first degree murder, with a special finding that they were armed within the meaning of section 12022, subdivision (a)(1).

Dckt. No. 2-1 at 2-10.

## II.   Procedural Background

Petitioner's judgment of conviction was affirmed in its entirety by the California Court of Appeal for the Third Appellate District. Dckt. No. 2-1.[5] Petitioner subsequently filed a petition for review in the California Supreme Court, which was summarily denied. Dckt. 2-3. Petitioner filed his federal habeas petition in this court on April 7, 2010.

---

[5] The Court of Appeal later modified its opinion without changing the judgment. Dckt. No. 2-2.

**III.    Analysis**

   **A.  Standards for a Writ of Habeas Corpus**

       An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

       Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

       For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

       A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

7

1    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

2    the writ if the state court identifies the correct governing legal principle from the Supreme

3    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[6]

4    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

5    F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ

6    simply because that court concludes in its independent judgment that the relevant state-court

7    decision applied clearly established federal law erroneously or incorrectly. Rather, that

8    application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v.*

9    *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

10   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

11   the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit

12   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

13   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

14   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a

15   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

16   state court's ruling on the claim being presented in federal court was so lacking in justification

17   that there was an error well understood and comprehended in existing law beyond any possibility

18   for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

19       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

21   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

23   ////

---

25   [6] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
26   (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2  considering de novo the constitutional issues raised.").

3      The court looks to the last reasoned state court decision as the basis for the state court

4  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

5  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6  previous state court decision, this court may consider both decisions to ascertain the reasoning of

7  the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

8  a federal claim has been presented to a state court and the state court has denied relief, it may be

9  presumed that the state court adjudicated the claim on the merits in the absence of any indication

10  or state-law procedural principles to the contrary."  *Harrington*, 131 S. Ct. at 784-85.  This

11  presumption may be overcome by a showing "there is reason to think some other explanation for

12  the state court's decision is more likely."  *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

13  803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

14  support its conclusion, a federal habeas court independently reviews the record to determine

15  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

16  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

17  review of the constitutional issue, but rather, the only method by which we can determine

18  whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.

19  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

20  there was no reasonable basis for the state court to deny relief."  *Harrington*, 131 S. Ct. at 784.

21      When it is clear, however, that a state court has not reached the merits of a petitioner's

22  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

24  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

25  ////

26  ////

**B. Petitioner's Claims**

**1. Jury Instruction on Felony Murder**

Petitioner's first claim is that the trial court violated his rights to due process, to present a defense, and to a fair trial when it gave an erroneous jury instruction that permitted the jury to convict him of murder without making essential findings regarding his state of mind.  Dckt. No. 2 at 3-6.  The California Court of Appeal explained the legal and factual background to this claim, and its ruling thereon, as follows:

> **I. CALJIC No. 8.51- *Ireland*[7] Error**
>
> During an in-chambers discussion, Carroll's attorney asked that the jury be instructed on second degree felony murder.  (CALJIC No. 8.32.)  The prosecutor was opposed, pointing out that there would be no predicate crime to which such an instruction could attach, and the trial court agreed.  In conformance with this ruling, the court deleted all references to felony murder in CALJIC Nos. 8.10 and 8.50.  The clerk's transcript reflects that the court refused defense requests for CALJIC Nos. 8.32 (second degree felony murder) and 8.34 (second degree felony murder-aider and abettor liability).  Nevertheless, at the request of defendants Carroll, Cooc and Ly, the trial court did give CALJIC No. 8.51.  As read to the jury, the instruction stated:
>
> "*If a person causes another's death, while committing a felony which is dangerous to human life, the crime is murder*.  If a person causes another's death, while committing a misdemeanor which is dangerous to human life under the circumstances of its commission, the crime is involuntary manslaughter.  [¶]  There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing an act or engaging in conduct in a criminally negligent manner, without realizing the risk involved, he is guilty of involuntary manslaughter. [¶] If, on the other hand, the person realized the risk and acted in total disregard of the danger to life involved, malice is implied, and the crime is murder."  (CALJIC No. 8.51, italics added.)
>
> Although the jury was never told which crime could qualify as a "dangerous-to-human-life" felony within the meaning of the above instruction, they were given CALJIC No. 9.02, which sets out the elements of assault by means likely to produce great bodily injury (hereafter also felonious assault).

---

[7]  *People v. Ireland* (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (*Ireland*).

All five defendants now claim that the giving of a felony-murder charge to the jury constituted prejudicial error because, under the "merger" doctrine, felonious assault may not be used as a predicate felony for applying the felony-murder rule. (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.)

We initially conclude that Carroll, Cooc and Ly are estopped from raising this claim. CALJIC No. 8.51 was explicitly requested by all three defendants. When defense counsel makes a deliberate, tactical choice to request a particular instruction, the rule of invited error applies, and the defendant cannot challenge it on appeal. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658, 20 Cal.Rptr.2d 788, 854 P.2d 80.) Here, defendants had a tactical purpose in requesting a felony-murder instruction. A reflexive adoption of the felony-murder rule using the predicate crime of felonious assault would have produced a verdict of second degree murder. (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.) A felony-murder instruction thus gave the jurors the option of shortcutting to a verdict of second degree murder without undertaking the more probing inquiry of whether defendants should be found guilty of *first degree* murder based on premeditation and/or lying in wait. Because there was a plausible tactical reason for requesting CALJIC No. 8.51 (i.e., avoiding a first degree murder verdict), Carroll, Cooc and Ly are precluded from challenging it on appeal. (*People v. Hardy* (1992) 2 Cal.4th 86, 152, 5 Cal.Rptr.2d 796, 825 P.2d 781.) However, we must still decide whether the instruction was prejudicial as to Dich and Lam.

In *Ireland, supra*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, the California Supreme Court adopted the "merger" rule in a case involving the underlying felony of assault with a deadly weapon, where the defendant had shot and killed his wife. The jury was instructed that the defendant could be convicted of second degree murder based on the felony-murder rule "'when the killing is a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, *such as an assault with a deadly weapon*.'" (*Id.* at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580, italics added.)

The state Supreme Court reversed, reasoning that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault – a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (*Ireland, supra*, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.) The court therefore concluded that the offense of assault with a deadly weapon, which was "an integral part of" and "included in fact " within the homicide, could not support a second degree felony-murder instruction. (*Ibid.*)

As the People concede and the trial court recognized at the hearing on the motion for new trial, it was *Ireland* error to include the first sentence of CALJIC No. 8.51 in the instruction.  However, we also agree with the trial court that the error was harmless beyond a reasonable doubt.

When a jury is instructed on an irrelevant theory that may inject confusion into its deliberations, we ask whether "there is 'a reasonable likelihood' the jury understood the instructions as the defendant asserts."  (*People v. Cain* (1995) 10 Cal.4th 1, 36, 40 Cal.Rptr.2d 481, 892 P.2d 1224, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399].)  In making this determination, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire, supra*, 502 U.S. at p. 72, 112 S.Ct. at p. ---- [116 L.Ed.2d at p. 399]; *see also People v. Mincey* (1992) 2 Cal.4th 408, 451, 6 Cal.Rptr.2d 822, 827 P.2d 388.)

This case is analogous to *People v. Barnett* (1998) 17 Cal.4th 1044, 74 Cal.Rptr.2d 121, 954 P.2d 384.  There, the trial court instructed, in pertinent part: "'The crime of murder is the unlawful killing of a human being with malice aforethought *or unlawful killing of a human being which occurs during the commission or attempted commission of a felony inherently dangerous to human life*.  [¶]  In order to prove the commission of the crime of murder, each of the following elements must be proved. . . .  [T]he killing was done with malice aforethought.'"  (*Id.* at p. 1154, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Barnett argued that this instruction was prejudicial because it allowed the jury to convict him of murder based on the commission of felonies that were impermissible under the merger doctrine, such as assault or assault with a deadly weapon.  (*Ibid.*)  The California Supreme Court found no reversible error because the other instructions given clearly informed the jurors that there could be no conviction of first degree murder unless they found deliberation and premeditation.  (*Ibid.*)  Moreover, the record was clear that the prosecutor was arguing for conviction on the theory of deliberate and premeditated murder, not felony murder.  (*Id.* at pp. 1154-1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Accordingly, the court concluded, "no reasonable juror could possibly have understood that guilt could be predicated upon a felony-murder theory."  (*Id.* at p. 1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)

A similar result is mandated here.  Unlike *Ireland* or the situation in defendants' favorite case, *Suniga v. Bunnell* (1993) 998 F.2d 664, 666, there was no instruction telling the jury *which felony* could qualify for felony-murder liability.  The verdict form did not ask the jury to identify a felony underlying a finding of murder and the trial court expressly refused to give any other instructions on the felony-murder rule.  Under these circumstances, giving the first

sentence of CALJIC No. 8.51 was akin to giving the jury a rod and a line, but no hook, lure or bait, and expecting it would catch a fish. The first sentence of CALJIC No. 8.51 was nothing but an orphaned charge that found no support in the other instructions with which the jury had to grapple.

Defendants hypothesize that the instruction was prejudicial because it could have induced the jury to assume the existence of malice without making the necessary findings on the elements thereof. However, nothing in CALJIC No. 8.51 told the jury it did not have to find malice before finding defendants guilty of murder. On the contrary, the instructions clearly required the jury to find malice in order to convict defendants of murder.[8] The jury was also instructed that the malice element would be negated if the killing was done in the heat of passion or under an unreasonable belief in the need for self-defense. These instructions are inherently inconsistent with the concept that a killing by means of felonious assault is automatically murder; and it would be unreasonable to conclude that the jury simply tossed them aside in favor of an incomplete felony-murder charge that did not identify a predicate felony for its application. (*See People v. Coddington* (2000) 23 Cal.4th 529, 594, 97 Cal.Rptr.2d 528, 2 P.3d 1081 [courts presume that jurors approach the instructions with intelligence and common sense], *overruled on other grounds* in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.) We find it unlikely the jury viewed the first sentence of CALJIC No. 8.51 as anything other than an irrelevant instruction that had no applicability to the case.

Lastly, neither the prosecutor nor defense counsel suggested to the jury that it could return a murder verdict based on the fact Seivert was killed during the commission of a felonious assault. Instead, the prosecutor urged the jury to return a verdict of first degree murder by lying in wait which, according to the instructions, required findings of (1) intent to inflict bodily harm involving a high degree of probability that it will result in death; (2) wanton disregard for human life; and (3) "a state of mind equivalent to premeditation or deliberation." The jury's verdict of first degree murder against accomplices Carroll, Cooc, Dich and Lam, coupled with its special-circumstance finding that Ly murdered by lying in wait, renders it virtually certain that the jury did not arrive at a murder verdict by using the felony-murder rule.

---

[8] Using the language of CALJIC No. 8.10, the trial court told the jury: "Defendants are accused of having committed the crime of murder. . . . [¶] . . . In order to prove this crime *each of the following elements must be proved*: [¶] . . . [¶][T]he killing was done with malice aforethought." (Italics added.) Using the language of CALJIC No. 8.11, the court then set out the legal requirements for a finding of malice.

1      We conclude beyond a reasonable doubt that any *Ireland* error was
2      harmless.

3   Dckt. No. 2-1 at 10-16.

4      Citing *Suniga v. Bunnell*, 998 F.2d 664 (9th Cir. 1993), petitioner argues that the trial

5   court's instructional error permitted the jury to convict him of felony-murder on "a theory of

6   culpability that [does] not exist" under California law.  Dckt. No. 2 at 4.  Petitioner does not

7   agree with the California Court of Appeal's conclusion that the jury would consider the

8   erroneous instruction an "orphaned charge," that "meant nothing."  *Id.* at 5.  He argues, "it is not

9   reasonably likely that the jury divined on its own that the erroneous instruction did not mean

10  what it said."  Dckt. No. 10 at 10.

11     Petitioner claims that the trial court's instructional error prejudiced him because: "(1) it

12  permitted the jury to convict him of murder upon a simple showing that (a) he had aided and

13  abetted Ly in a felonious, dangerous-to-life assault and that (b) Ly had caused the victim's death

14  while committing that assault, without also making the essential finding that (c) the killing was

15  accompanied by the subjective mental state on the part of Ly required for murder, *i.e.*, express or

16  implied malice; and (2) even if the jury were to find that Ly had acted with malice, the

17  instructional error permitted the jury to convict petitioner for the murder without also making the

18  essential finding that the malice murder was a 'natural-and-probable' consequence of the

19  planned assault that petitioner had aided and abetted, that is, that it was reasonably foreseeable to

20  him."  Dckt. No. 2 at 4-5.  Petitioner summarizes his argument regarding prejudice as follows:

21         The instructional error, in fact, had a substantial and injurious
           effect or influence in determining the jury's verdict.  It relieved the
22         prosecution of its burden of proving two essential elements that
           were necessary for securing a murder conviction against petitioner,
23         namely, that the killer, Ly, had acted with malice and, if so, that
           the killing was a natural-and-probable consequence of the
24         assaultive conduct in which petitioner jointly participated.  As to
           the first of these two elements, whether Ly had acted with express
25         or implied malice, or, if he had, whether that malice was nullified
           by his honest albeit unreasonable belief in the need to defend
26         himself were key factual issues contested at trial.  Had the

14

1
2
3
4
5

> erroneous instruction not been given, a rational jury could have
> had a reasonable doubt as to the presence of malice.  As to the
> second, "natural and probable cause" element, a rational jury,
> based on the record evidence and absent the erroneous instruction,
> could have concluded that it was not reasonably foreseeable that
> the planned non-lethal assault would lead to Ly's committing a
> malice murder, and thus might well have convicted petitioner only
> of manslaughter while convicting Ly of malice murder.

6   *Id.* at 5-6.  Petitioner also contends that the California Court of Appeal utilized the wrong

7   standard to determine whether the instructional error was harmless.  Dckt. No. 10 at 28-30.

8        In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the United States Supreme Court clarified

9   that the AEDPA did not replace the traditional test for prejudice on collateral review established

10  in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).[9]  After *Fry*, a federal habeas court must

11  assess the prejudicial impact of constitutional error in a state-court criminal trial under the

12  'substantial and injurious effect' standard set forth in *Brecht* 507 U.S. 619.  Further, [w]hen a

13  state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal

14  court may not grant habeas relief unless the state court's determination is objectively

15  unreasonable." *Towery v. Schriro*  641 F.3d 300, 307 (9th Cir. 2010).[10]

16       The California Court of Appeal concluded that the instructional error in this case was

17  harmless "beyond a reasonable doubt" because: (1) the erroneous jury instruction was an

18  incomplete statement of the felony-murder rule, and was inconsistent with other jury instructions

19  with regard to the requirement to find malice before reaching a guilty verdict on a murder

20

21       [9]  *Brecht* held that on collateral review of a state court criminal judgment under 28 U.S.C.
§ 2254, an error is harmless unless it had "a substantial and injurious effect or influence in
determining the jury's verdict."  507 U.S. at 631.

22

23       [10]  The court notes that the instructional error at issue here is not a structural error which
requires automatic reversal, but is a trial error subject to harmless error analysis.  *See Hedgpeth*
24  *v. Pulido*, 555 U.S. 57 (2008) (instructing a jury on multiple theories of guilt, one of which is
invalid, is subject to *Brecht* harmless error analysis); *Neder v. United States*, 527 U.S. 1 (1999)
25  (erroneous jury instruction that omits element of offense is subject to harmless-error analysis);
*Byrd v. Lewis*, 566 F.3d 855, 863-64 (9th Cir. 2009) (harmless error review applies to an
26  instructional error that affects an element of the offense, a permissible evidentiary inference, or a
potential theory of conviction).

1   charge, and was therefore unlikely to have been relied on by the jury in this case; (2) numerous

2   other jury instructions informed the jurors that they had to find malice in order to convict

3   petitioner and the other defendants of murder; (3) other jury instructions, including one which

4   informed the jury that the malice element could be negated by other factors in the case, were

5   inconsistent with a theory that the jury did not have to find malice in order to convict the

6   defendants of murder; (4) it was unreasonable to conclude that the jury ignored the bulk of the

7   jury instructions and instead found the defendants guilty of murder without a finding of malice,

8   based on one incomplete instruction that did not tell the jurors they could dispense with the

9   malice requirement; (5) the prosecutor specifically relied on a theory of first degree murder by

10   lying in wait, which required a finding of malice; and (6) the jury found defendants guilty of first

11   degree murder by lying in wait, which reflected that they did not rely on a felony murder theory

12   to reach their verdict.  This court agrees with the state appellate court that, under these

13   circumstances, the instructional error in this case was harmless.  Viewing the trial record as a

14   whole, and for the reasons expressed by the California Court of Appeal, it is reasonable to

15   conclude that the erroneous language contained in CALJIC No. 8.51 could not have had a

16   substantial or injurious effect on the verdict in this case.  Certainly the decision of the California

17   Court of Appeal is not "so lacking in justification that there was an error well understood and

18   comprehended in existing law beyond any possibility for fairminded disagreement."

19   *Harrington*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to habeas relief.

20          This court rejects petitioner's argument that CALJIC No. 8.51, as given, caused the jury

21   to disregard all of the other, correct instructions on the need to find malice in order to return a

22   first degree murder verdict.  There is no evidence that this is the case, and "a single instruction to

23   a jury may not be judged in artificial isolation, but must be viewed in the context of the overall

24   charge" *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  The court also rejects petitioner's

25   claim that the erroneous language prevented him from presenting his defense that he lacked the

26   mental state required for a guilty verdict on the murder charge.  That defense was fully presented

16

1    to the jury.  Finally, the court notes that none of the defendants in this case objected to the giving

2    of CALJIC No. 8.51.  "It is the rare case in which an improper instruction will justify reversal of

3    a criminal conviction when no objection has been made in the trial court."  *Henderson v. Kibbe*,

4    431 U.S. 145, 154 (1977).

5         Petitioner's reliance on *Suniga v. Bunnell* in support of this claim is misplaced.  In

6    *Suniga*, a case decided prior to the enactment of AEDPA, the court gave both a proper murder

7    instruction and an improper felony-murder instruction.  However, unlike here, the jury was

8    specifically instructed that assault with a deadly weapon was a felony that is inherently

9    dangerous to human life.  998 F.2d at 667.  Further, in *Suniga*, it was not possible to determine

10   with certainty whether the jury relied on the unconstitutional theory to reach its guilty verdict.

11   *Id.* at 668, 669.  The Ninth Circuit recognized that the erroneous felony-murder instruction

12   permitted the jury to convict the defendant on the basis of a nonexistent legal theory.  *Id.*  In that

13   court's view, under these circumstances the erroneous instruction "infected the entire trial,"

14   violated due process, and required that the defendant's conviction be set aside without a showing

15   of harmless error.  *Id.*  Although the California Court of Appeal had found the instructional error

16   to be harmless, the Ninth Circuit was not required to defer to this determination because it was

17   not constrained by AEDPA.

18        Here, unlike in *Suniga*, the predicate offense for felony murder was not identified for the

19   jury, and the verdict indicated that the jury did not rely on a theory of felony-murder to find the

20   defendants guilty of murder.  Indeed, the California Court of Appeal opined that it was "virtually

21   certain that the jury did not arrive at a murder verdict by using the felony-murder rule."  Dckt.

22   No. 2-1 at 16.  *Suniga* is therefore factually distinguishable and does not dictate the result here.

23   *See Townsend v. Knowles*, 562 F.3d 1200, 1210 (9th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct.

24   193 (2009), *abrogated on other grounds* by *Walker v. Martin*, ___ U.S. ___ (2011)

25   (distinguishing *Suniga* and rejecting petitioner's claim that an erroneous felony-murder

26   instruction allowed his jury to find him guilty of murder without proof of malice aforethought, in

1   part because the jury verdict indicated that "the jury must have found that he acted with malice"

2   when they found petitioner guilty of second degree murder, which requires a finding of malice

3   aforethought); *Shackleford v. Hubbard*, 234 F.3d 1072, 1077-79 (9th Cir. 2000) (distinguishing

4   *Suniga* because, even though jury was instructed on non-existent felony murder theory, error was

5   harmless because it was certain that the jury returned a guilty verdict on the legally correct

6   theory of first-degree murder by torture); *Williams v. Carey*, No. C 05-3891 RMW(PR), 2010

7   WL 143465 at **4-5 (N.D. Cal. Jan. 5, 2010) (distinguishing *Suniga* and finding that erroneous

8   felony-murder instruction did not violate petitioner's right to due process where the jury was not

9   given any other instructions on the felony murder theory; the jury was not instructed on whether

10  any other felonies would qualify as an inherently dangerous felony; the trial court properly

11  instructed on second degree murder as well as express and implied malice; and the jury was

12  instructed to consider the instructions as a whole and in light of all the other instructions);

13  *Thomas v. Lamarque*, No. C 02-2981 VRW, 2005 WL 679745 at **6-7 (N.D. Cal. March 16,

14  2005) (distinguishing *Suniga* because the jury in that case was not instructed that assault with a

15  deadly weapon is a felony and because "the [erroneous] instruction was a solitary and

16  inapplicable statement of law among a large number of correct and applicable jury

17  instructions"); *Orellana v. Castro*, No. C 00-2466 SI (PR), 2001 WL 590006 at *5 (N.D. Cal.

18  May 23, 2001) (distinguishing *Suniga* on the basis that the predicate crime for felony murder

19  was not identified for the jury).

20      Accordingly, for the reasons set forth above, petitioner is not entitled to habeas relief on

21  this jury instruction claim.

22      **2. Refusal to Give Proposed Jury Instruction Regarding Aiders and Abettors**

23      Petitioner's next claim is that the trial court violated his rights to due process, to present a

24  defense, and to a fair trial "when it refused to instruct the jury that one responsible under the

25  natural-and-probable consequences doctrine for a homicide perpetrated by another nevertheless

26  may be convicted of a *lesser degree* of homicide than the perpetrator, because only that lesser

form of homicide was reasonably foreseeable."  Dckt. No. 2 at 6.  The California Court of

Appeal denied this claim, reasoning as follows:

### III. Refusal to Give Proposed Defense Instruction

During a discussion of jury instructions, Lam's attorney requested that the trial court supplement CALJIC No. 3.00 with the language italicized below:  "Each principal, regardless of the extent or manner of participation, is equally guilty, *except that an aider and abettor may be found guilty of a lesser offense than the perpetrator*."  (Italics added.)  The trial court refused to give the augmentation, ruling that it did not belong in the standard instruction.

Carroll, Cooc and Dich now claim the court committed prejudicial error in failing to accede to Lam's proposal, even though none of them joined in it at trial.  They urge that the added language was a correct statement of law according to *People v. Woods* (1992) 8 Cal.App.4th 1570, 1589-1590, 11 Cal.Rptr.2d 231 (*Woods*), and necessary to a full understanding of principal and accomplice liability.

*Woods* does not support defendants' assertion that the trial court was obligated to give the augmentation.  In *Woods*, the jury sent a note to the court asking if an accomplice could be found guilty of murder in the second degree if the actual perpetrator were determined to be guilty of first degree murder.  (*Woods, supra*, 8 Cal.App.4th at p. 1579, 11 Cal.Rptr.2d 231.)  The trial court incorrectly answered the question, "No," and the appellate court reversed.  (*Id.* at pp. 1579, 1590.)  *Woods* never held or suggested that the jury should, as a routine matter, be advised of the viability of a lesser verdict as to an accomplice.

Here, the trial court specifically instructed the jurors that they must decide each defendant's guilt separately.  The jurors were also told that if they were not satisfied beyond a reasonable doubt that any defendant was guilty of the crime charged, they could find him or her guilty of any lesser crime shown by the evidence.  In closing argument, the prosecutor reminded the jurors: "We have five defendants.  You have to look at each individually and make a determination about each one individually."

Generally, "'a trial court may refuse a proffered instruction if it . . . is duplicative.'"  (*People v. Brown* (2003) 31 Cal.4th 518, 559, 3 Cal.Rptr.3d 145, 73 P.3d 1137.)  A trial court does not err by refusing to give specially requested instructions that are redundant (*People v. Cash* (2002) 28 Cal.4th 703, 736, 122 Cal.Rptr.2d 545, 50 P.3d 332; *People v. Turner* (1994) 8 Cal.4th 137, 203, 32 Cal.Rptr.2d 762, 878 P.2d 521) or adequately covered by other instructions (*People v. Noguera* (1992) 4 Cal.4th 599, 648, 15

1  Cal.Rptr.2d 400, 842 P.2d 1160).  Since the concept embodied in
   defendants' proposed modification of CALJIC No. 3.00 was
2  conveyed by other instructions and each defendant had the
   opportunity to argue the principle to the jury, the court's refusal to
3  give the proposed addition to CALJIC No. 3.00 was not error, or
   was certainly harmless.  (*See People v. Hughes* (2002) 27 Cal.4th
4  287, 361-363, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

5  Dckt. No. 2-1 at 19-21.

6        Petitioner also argues that the trial court exacerbated its error in refusing to give his

7  requested jury instruction when it responded to a jury question in a way that "could have been

8  reasonably understood as precluding a jury finding that petitioner was guilty of a lesser offense

9  than the individual who perpetrated the homicide."  Dckt. No. 2 at 6.  The background to this

10 argument is the following.  During deliberations, the jury asked the following question: (1) "We

11 want to know, can you have second degree murder with lying in wait?"  Reporter's Transcript on

12 Appeal (RT) at 3496.  The court responded, "Please clarify your question.  Is your question as to

13 the degree of murder or the special circumstance allegation within the meaning of Penal Code

14 Section 190.2(a)(15)?"  *Id.*  The jury responded to the court's question by asking: "Is it possible

15 for the jury to find the defendant guilty of second degree murder and lying in wait?  Or is the

16 finding of lying in wait significant in determining that the murder is first degree?"  *Id.* at 3497.

17 The trial court responded to this question as follows: "All murder which is perpetrated by means

18 of lying in wait is murder of the first degree.  You may find it helpful to refer to Instruction

19 8.25.[11]  If this answer does not sufficiently answer your question, or if you have additional

20 questions, please set them forth in writing."  CT at 1685.  Petitioner argues that the trial court's

21 response, "although technically correct as an abstract statement of the law," did not clearly

22 apprise the jury that, under California law (the *Woods* decision), petitioner could be found guilty

23 of a lesser crime than Ly if it was only that lesser crime that was reasonably foreseeable to

24 petitioner.  Dckt. No. 2 at 7.

25 _____

26      [11]  Jury Instruction No. 8.25 stated, in pertinent part, "Murder which is immediately
   preceded by lying in wait is murder of the first degree."  CT at 1587.

Petitioner also raised this claim on direct appeal.  He argued that "the court should instead have told the jury, pursuant to *Woods, supra*, 8 Cal.App.4th at page 1579, that an aider and abettor may be guilty of second degree murder, even if the perpetrator committed murder by lying in wait.  Dckt. 2-1 at 38-39.  The California Court of Appeal rejected this argument, reasoning as follows:

> In rejecting this same claim on a motion for new trial, the trial court stated: "The Court's response to the jury's two questions about lying in wait and second degree murder . . . was a correct statement of the law.  The jury did not ask the question that the jurors did in *People v. Woods* (1992) 8 Cal. App.4th 1570, where the question was whether aiders and abettors could be guilty of a lesser degree of murder than the perpetrator.  Here there was no mention of aiders and abettors.  Instead the question was addressed to the degree of murder associated with lying in wait.  The Court correctly stated all murder committed by means of lying in wait is first degree murder.  It referred the jurors to an instruction previously given and invited additional questions.  There were none. [¶ ] The court cannot conjecture that the jurors were actually asking a different question from the one they actually posed."

> The court's ruling and observations were unassailable.  The question posed by the jury said nothing about aiding and abetting.  The jury wanted to know if a defendant could be found guilty of both second degree murder *and* lying in wait.  The trial court properly answered that *all murder* committed by lying in wait is that of the first degree and referred it to the applicable jury instruction.  The jury, apparently satisfied, asked for no further elaboration.

> * * *

> The trial court's decision to accurately answer only the question that was asked by the jury was reasonable and proper.  No abuse of discretion occurred.

*Id.* at 39-40.

In his claim before this court, petitioner argues that the trial court "read the jury's request too narrowly."  Dckt. No. 10 at 45.  He explains, "whether or not the jury framed its inquiry specifically in terms of aiding-and-abetting liability, its question necessarily implicated the *Woods* doctrine, and the question could only be fully and correctly answered by an answer informed by that doctrine."  *Id.*  He also argues, "the fact that the trial court earlier had

1  improperly denied petitioner's request that the jurors be educated on the *Woods* principle

2  obligated the court to make up for its earlier error by addressing the issue squarely following the

3  jury notes." *Id.*

4      Petitioner asserts that the correct answer to the jury's instruction was that it was indeed

5  possible to find second degree murder with lying in wait because, under *Woods*, the jury could

6  have found petitioner guilty of second-degree murder even if they found that Ly was guilty of

7  first-degree murder by lying in wait. *Id.* at 44. Thus, petitioner argues, the trial court's answer

8  could have misled the jury into thinking they could not convict petitioner of anything other than

9  first-degree murder. *Id.* In other words, according to petitioner, the trial court's failure to give a

10 *Woods* instruction made its response to the jury's question incomplete and potentially

11 misleading. *Id.*

12     Petitioner also argues that the trial court's failure to give the requested jury instruction

13 violated his right to present the defense that he was guilty of a lesser crime than first degree

14 murder, and his right to a jury instruction on that theory of defense. Dckt. No. 2 at 7. Petitioner

15 explains that the trial court's failure to give the *Woods* instruction violated the trial court's duty

16 to clear up the jury's confusion with concrete accuracy, violated his right to jury instructions that

17 do not omit an element of the charged crime, and violated his right to have the jury decide every

18 factual issue posed by the evidence. *Id.* at 7-8. With respect to his right to present a defense,

19 petitioner argues that, under the circumstances of this case, the jury might well have convicted

20 him of a lesser crime than first degree murder, especially given the lack of evidence that

21 petitioner knew Ly had a gun. Dckt. No. 2 at 8; Dckt. No. 10 at 44.

22     Petitioner notes that the jury received the following instruction:

23         Persons who are involved in committing or attempting to commit a
        crime are referred to as principals in that crime. Each principal

24         regardless of the extent or manner of participation is equally
        guilt[y].

25

26 Dckt. No. 2 at 6; RT at 3149. The jury was also instructed that "[p]rinciples include . . . those

22

1    who aided and abetted the commission or attempted commission of the crime."  RT at 3149.

2    Petitioner argues that these instructions would have given the jury the impression that petitioner

3    had to be convicted of the same charges as Ly.

4         Petitioner also argues that the trial court's refusal to instruct the jury on the *Woods*

5    doctrine, and its responses to the jury's question, invited jurors to dispense with their obligation

6    to make findings on every factual issue posed by the evidence.  Dckt. No. 10 at 46.  He argues

7    that the instructions actually given to the jury "informed jurors that if Ly was guilty of first

8    degree murder based on lying in wait, petitioner was no less guilty because (1) he had simply

9    been "involved" in committing that crime and (2) Ly's lying in wait was necessarily imputed to

10   petitioner."  *Id.*  Petitioner contends that this constituted an impermissible mandatory

11   presumption because it "mandated a finding that if petitioner had in any way participated in the

12   events leading to Seivert's killing, he necessarily was guilty of the most serious offense found as

13   to any other principal."  *Id.* at 47.  He argues that "a rational juror could well have understood

14   [the trial court's response to the jury's question] to impose a mandatory duty to find petitioner

15   guilty of first-degree murder upon finding Ly guilty of first-degree murder through a lying-in-

16   wait theory, thereby improperly removing from the jury's consideration the essential question of

17   petitioner's degree of guilt in light of what offense was reasonably foreseeable to him."  *Id.* at

18   48.

19        The issue before this court is not whether the trial court's failure to give petitioner's

20   requested jury instruction violated California law, but whether the court's failure to give the jury

21   instruction violated petitioner's federal constitutional rights.  "[F]ederal habeas corpus relief

22   does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  In the context of

23   this habeas petition, this court must determine whether the state court's decision rejecting this

24   claim was contrary to or an unreasonable application of United States Supreme Court authority.

25        In general, a challenge to jury instructions does not state a federal constitutional claim.

26   *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." *Cupp*, 414 U.S. at 146.  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where, as here, the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155.  *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997).

The California Court of Appeal concluded that the trial court's failure to give petitioner's requested jury instruction that he could be found guilty of a lesser offense than Ly was harmless because other jury instructions essentially told the jury the same thing.  This conclusion is not unreasonable.  Although petitioner's jury was not specifically told that "an aider and abettor may be found guilty of a lesser offense than the perpetrator," the jury was informed that "they must decide separately whether each of the defendants is guilty or not guilty," and that they could find a defendant "guilty of any lesser crime provided you are satisfied beyond a reasonable doubt that he or she is guilty of the lesser crime." Clerk's Transcript on Appeal (CT) at 1604, 1620.  Although these instructions do not contain the identical language suggested by petitioner, they essentially gave the same message to the jury: that the culpability of each defendant must be decided separately, and that each defendant could be found guilty of a "lesser crime" if the evidence showed they were guilty of that lesser crime.  The prosecutor reinforced this theme when she told the jury that "We have five defendants.  You have to look at each individually and

make a determination about each one individually."  RT at 3458.  The jury was also informed that "an act that is a fresh and independent product of the mind of one of the participants is not a natural and probable consequence."  *Id.* at 3151.  Under the circumstances presented here, the trial court's failure to give petitioner's requested instruction did not have a substantial and injurious effect or influence in determining the jury's verdict.

The trial court's response to the jury's question, described above, does not change this result.  There is no evidence in the record that the jury was confused about whether it could find aiders and abettors guilty of a lesser crime than the perpetrator.  The state trial and appellate courts found that the jury's question was "addressed to the degree of murder associated with lying in wait," and that the trial court's actions in referring the jury to CALJIC No. 8.25 cleared up the jurors' confusion on that score.  This finding is not unreasonable.

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."  *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  However, where, as here, the trial judge "'respond[s] to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry,' and the jury asks no followup question," a reviewing court can presume "that the jury fully understood the judge's answer and appropriately applied the jury instructions."  *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009) (quoting *Weeks*, 528 U.S. at 234) ("A jury is presumed to understand a judge's answer to a question.").  Under these established standards, it was not objectively unreasonable for the state court to conclude that petitioner's jury received the answers it needed to resolve its confusion over the degree of murder associated with lying in wait.  The fact that the jurors asked no further questions and were able to reach a unanimous verdict indicates that they were satisfied with the court's answer and that it cleared up their confusion.

For the foregoing reasons, petitioner is not entitled to relief on this claim.

////

### 3.  Improper Exclusion of Evidence

In his final ground for relief, petitioner claims that the trial court violated his constitutional rights to due process, a fair trial, compulsory process, and to present a complete defense when it excluded Ly's statements to police that he shot Seivert because he believed Seivert was about to run him over with his car.  Dckt. No. 2 at 10.  The California Court of Appeal denied this claim, reasoning as follows:

### II. Exclusion of Ly's Statements to the Police

Pursuant to Evidence Code sections 1250 and 1252, Carroll, Cooc, Dich and Lam moved to introduce Ly's statements to police, in which Ly claimed that he shot Seivert because he feared that the victim was about to run him over.  The statements were made on January 10, almost three weeks after the killing of Seivert.  After initially denying any connection with the murder, Ly admitted that he fired three shots at the Camry, adding that he did so because he thought Seivert was going to run him over.

The trial court refused to admit the evidence, finding that, under the totality of the circumstances, the statements were not trustworthy because they were made (1) in a coercive atmosphere of police interrogation; (2) while Ly knew he was under suspicion for murder; and (3) at a time when Ly "had every reason to come up with an explanation for his actions."  Defendants claim the evidentiary ruling constituted an abuse of discretion.

Evidence Code section 1250, subdivision (a) provides: "*Subject to [Evidence Code] Section 1252*, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Italics added.)  Section 1252 provides: "Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

"'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.  Such an endeavor allows, in fact demands, the exercise of discretion.' [Citation.]  A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion." (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820,

1         1 Cal.Rptr.2d 696, 819 P.2d 436 (*Edwards*).)

2         "To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness.

3         Such declarations are admissible only when they are '"made at a time when there was no motive to deceive."'" (*Edwards, supra,*

4         54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.)

5

6         We can conceive of few examples of an untrustworthy statement more worthy of exclusion under Evidence Code section 1252 than one made by a defendant who, during a police interrogation, after

7         having initially denied any involvement in the crime, makes a statement admitting guilt but seeking to minimize or eliminate his

8         culpability.  As in *Edwards*, where the defense sought to introduce a taped statement by the defendant shortly after his arrest, Ly "had

9         a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shooting[ ]."

10        (*Edwards, supra,* 54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.)  The trial court did not abuse its discretion.

11

12        Even if the trial court erroneously excluded Ly's statements, we see no prejudice from the ruling.  The jury heard testimony from

13        several different sources that Ly told his companions after the shooting he "did what [he] had to do" and that he shot Seivert because he feared Seivert was going to run him over with the

14        Camry.  Indeed, defense counsel used these statements as a cornerstone of their argument against a murder verdict.  Ly's

15        unsurprising repetition of the same exculpatory statements almost three weeks after the shooting was cumulative of other testimony

16        and would not have significantly altered the jury's evaluation of the events that night.  Under any standard, the error was harmless.

17        (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *see also People v. Fudge* (1994) 7 Cal.4th 1075,

18        1102-1103, 31 Cal.Rptr.2d 321, 875 P.2d 36 [applying harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d

19        243 (*Watson*) to erroneous exclusion of evidence].)

20 Dckt. No. 2-1 at 16-19.

21        Petitioner argues that he had "a constitutional right to introduce Ly's statements *even if*

22 they were properly excludable under the state's evidentiary rules" because "criminal defendants

23 have a federal constitutional right 'to put before a jury evidence that might influence the

24 determination of guilt.'"  Dckt. No. 2 at 11.  He argues that the trial court "mechanistically"

25 enforced state hearsay rules in excluding this evidence.  *Id.*  Citing *Chia v. Cambra*, 360 F.3d

26 997, 1004 (9th Cir. 2004), petitioner argues that this court must apply a five-part balancing test

to determine whether the trial court's exclusion of Ly's statements violated his right to due process. *Id.* at 12. According to petitioner, after applying those five factors "it is clear that Ly's excluded statements were crucial to petitioner's defense and necessary to refute the prosecution's arguments that Ly had not acted in imperfect self-defense and that the homicide was a natural-and-probable consequence of the assault that petitioner had aided and abetted." *Id.*

Petitioner acknowledges that several trial witnesses testified that Ly told them he shot Seivert because Seivert tried to run him over with his car. However, petitioner argues that it was important to admit Ly's statements to police, notwithstanding this evidence, because Ly's statements were on videotape and were more detailed than the "perfunctory" trial testimony on the same subject. Dckt. No. 2 at 12; Dckt. No. 10 at 57. He also argues that Ly's statements were "most likely true." Dckt. No. 10 at 59.

The United States Supreme Court has acknowledged a "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. at 68-70. The United States Supreme Court has not "squarely addressed" whether a state court's exercise of discretion to exclude testimony violates a criminal defendant's right to present relevant evidence. *Moses*, 555 F.3d at 758-59. Accordingly, the decision of the California Court of Appeal that the trial court's discretionary evidentiary ruling did not violate the federal constitution is not contrary to or an unreasonable application of clearly established United States Supreme Court precedent and may not be set aside. *Id. See Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam) (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given no clear answer to the question presented, let alone one in [the petitioner's] favor," because the state court cannot be said to have unreasonably applied clearly established Federal law). *See also Anguiano v. Morales*, No. C 98-4751 SI(PR), 2000 WL 630870 at *9 (N.D. Cal. May 2, 2000)

1    (trial court's exercise of discretion under Cal. Evid. Code § 1252 to exclude untrustworthy

2    evidence did not violate defendant's right to present a defense).[12]

3           Even assuming arguendo that the trial court's exclusion of Ly's statements to police was

4    constitutional error, the error could not have had a "substantial and injurious effect or influence

5    in determining the jury's verdict" under the circumstances of this case.  *Brecht*, 507 U.S. at 623.

6    Several trial witnesses testified that Ly told them he shot Seivert because he thought Seivert was

7    going to run him over with his car.  One witness testified that Ly shot Seivert "as defense."  *See*

8    RT at 1907-08, 1989, 2151, 2285-86, 2309, 2311.  Ly's statements to police were essentially

9    cumulative of this trial testimony.  *See* CT at 2861, 2874-78, 2880-81, 2906.  Several of the

10   defense counsel, including petitioner's counsel, emphasized this trial testimony in their closing,

11   arguing that Ly shot Seivert because he was afraid he was going to get run over by Seivert's car.

12   *See, e.g.*, RT at 3247-49 (Ly's counsel), 3310, 3312 (petitioner's counsel).  Accordingly, Ly's

13   state of mind at the time of the shooting; i.e., that he shot Seivert only after Seivert attempted to

14   run him over, was squarely before the jury.  The absence of cumulative testimony to the same

15   effect would not have effected the outcome of this trial.

16          The decision of the California Court of Appeal was not contrary to or an unreasonable

17   application of clearly established Federal law on the constitutional rights to present a defense, to

18   due process, or to confrontation of witnesses.  Accordingly, petitioner is not entitled to relief on

19   this claim.

20   _____

21          [12]  In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality
     of a trial court's discretionary decision to exclude evidence.  *See Miller v. Stagner*, 757 F.2d 988,
22   994-95 (9th Cir. (1985).  That test was also employed in *Chia v. Cambra*, 360 F.3d 997, 1003-04
     (9th Cir. 2004), the case relied on by petitioner in support of this claim.  However, in *Moses*, the
23   Ninth Circuit concluded that the *Miller* balancing test "is a creation of circuit law," rather than
     clearly established Supreme Court precedent, for purposes of Section 2254(d)(1).  555 F.3d at
24   759-60.  Therefore, the *Miller* test should not be used in federal habeas review of a challenge to
     a state court's exercise of discretion to exclude testimony pursuant to a state evidentiary rule
25   affording such discretion.  *Id.*  "The AEDPA does not permit [a habeas court] to rely on [the
     *Miller*] balancing test to conclude that a state trial court's exclusion of evidence . . . violated
26   clearly established Supreme Court precedent."  *Id.* at 760.

1  **IV.  Conclusion**

2          Petitioner is not entitled to relief on any ground raised in the petition.

3          Accordingly, IT IS ORDERED that petitioner's application for a writ of habeas corpus

4  under 28 U.S.C. § 2254 is denied and the Clerk is directed to close the case.

5          IT IS FURTHER ORDERED that the court declines to issue a certificate of

6  appealability.[13]  Any further request for a Certificate of Appealability must be addressed to the

7  Court of Appeals.[14]

8  DATED:  April 5, 2012.

9                              EDMUND F. BRENNAN
                               UNITED STATES MAGISTRATE JUDGE

---

25      [13]  28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

26      [14]  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

30